**Wes WILSON, et al.**

v.

**MOBIL OIL CORP., et al.**

**Civil Action No. 95–4174.**

United States District Court,
E.D. Louisiana.

Sept. 9, 1996.

James Frederick Willeford, James F. Willeford, New Orleans, LA, for Wes Wilson.

Charles Kirk Reasonover, Deutsch, Kerrigan & Stiles, New Orleans, LA, Andrew J. Kilcarr, Maureen O'Bryon, William L. Monts, III, Lowell R. Stern, Hogan & Hartson, Washington, DC, for Mobil Oil Corp.,

Steven W. Copley, Ernest Enrique Svenson, Gordon, Arata, et al., New Orleans, LA, Thomas E. O'Keefe, SpeeDee Oil Change & Tune–Up, General Counsel, Madisonville, LA, for SpeeDee Oil Change Systems, Inc., G.C. & K.B. Investments, Inc.

### ORDER AND REASONS

VANCE, District Judge.

This matter is before the Court on the motions to dismiss of defendants, Mobil Oil Corporation ("Mobil"), SpeeDee Oil Change Systems, Inc. ("SpeeDee"), and G.C. & K.B. Investments, Inc. (SpeeDee and G.C. & K.B. Investments, Inc. will be collectively referred to as the "SpeeDee defendants"). The Court heard oral argument on the motions. For the reasons stated below, defendants' motions are granted in part and denied in part.

## I. BACKGROUND

This is an action for violation of Section 1 of the Sherman Act[1], Section 3 of the Clayton Act[2], and Section 5 of the Federal Trade Commission Act[3] brought by nine current or former SpeeDee franchisees.[4] Plaintiffs also sue under the Louisiana antitrust laws[5] and for fraud under Louisiana Civil Code article 1953. Plaintiffs alleged that defendants have

---

1. 15 U.S.C. § 1.

2. 15 U.S.C. § 14.

3. 15 U.S.C. § 45.

4. Wes Wilson; Jimmy L. Elliott; Jimmy and Daughters, Inc.; Milton Rizan, Jr.; Tript Enter- prises, Inc.; Axel Enterprises, Inc.; John and Susan Spencer; John W. Spencer Interests, Inc.; George Gerhart; and Save Services, Inc.

5. La.Rev.Stat.Ann. § 51:122, *et seq.*

engaged in illegal tying by requiring that they purchase motor oil lubricant products, equipment and financial services from Mobil in order to become and remain SpeeDee franchisees. In addition, they claim that defendants have conspired illegally to fix the price of Mobil's products. Plaintiffs also claim that defendants defrauded them by failing to disclose the nature of the financial and other arrangements between them. Although plaintiffs argue in their brief that they have asserted a monopolization claim under Section 2 of the Sherman Act, 15 U.S.C. § 2, there are no such allegations in their first amended and restated complaint, and therefore no such claim has been stated.

The complaint in this action contains allegations that are at times vague, confusing and contradictory. Nevertheless, the Court will attempt to recount the factual background of this dispute as it relates to the pending motions.

The SpeeDee defendants sell business format franchises to operate quick car-care service outlets under SpeeDee trademarks and service marks. The outlets provide goods and services for oil change, tune-ups, transmission services, and other car-care needs. Compl. at ¶¶ 25–27, 30. Plaintiffs are present or former SpeeDee franchisees located in Louisiana, Mississippi, Texas and Alabama. Plaintiffs allege that SpeeDee ranks fourth or fifth in the "national fast lube" market. *Id.* at ¶¶ 15, 35.

Between 1987 and 1989, the SpeeDee defendants contracted with Castrol Oil Company to be the provider of lubricant products to the SpeeDee franchise system. *Id.* at ¶ 37. SpeeDee allegedly had the right to require franchisees to use only approved suppliers. *Id.* at ¶ 38. The contract between SpeeDee and Castrol was terminated in 1989 when SpeeDee agreed that Mobil would become the exclusive lubricant supplier to all SpeeDee Oil Change & Tune–Up locations. In 1991, SpeeDee and Mobil entered into a 15–year agreement for Mobil to become the exclusive supplier of automotive products at all franchised units in exchange for $650,-000.00. *Id.* at ¶ 39. Plaintiffs claim that the $650,000.00 was never used for its intended purpose of assisting franchisees with adver-

tising but was instead pocketed by SpeeDee's principals. *Id.* at ¶¶ 40–41, 44. Further, the 1991 agreement secured Mobil against breach by SpeeDee by providing for liquidated damages ranging from $1.5 million to $3.5 million, secured by the pledge of 40% of SpeeDee's stock. *Id.* at ¶¶ 42–43. Plaintiffs allege that the SpeeDee defendants received the $650,000.00 for tying the sale and continued operations of SpeeDee franchises to the exclusive use of Mobil's products. *Id.* at ¶ 44. Plaintiffs allege that Mobil and SpeeDee formed an illegal joint venture in which Mobil provided financial backing in exchange for making the SpeeDee franchise network a captive market for its products. *Id.* at ¶ 68.

It is clear from plaintiffs' complaint that they allege that the use of Mobil as an exclusive supplier was a condition precedent to being sold a franchise. Compl. at ¶ 50. However, it is not clear from the complaint what information was disclosed about the arrangement with Mobil and at what stage of the dealings between the parties the information was provided. Plaintiffs clearly allege that they were not apprised of the extent of the financial arrangements between Mobil and SpeeDee, such as that SpeeDee would have to pay liquidated damages of up to $3.75 million secured by the pledge of 40% of SpeeDee's stock if it allowed the franchisees to purchase elsewhere. Further, plaintiffs assert that "all of the franchisees' purchase agreements with Mobil constituted a hidden condition of their SpeeDee franchise agreement and a condition of their continuing to do business as a SpeeDee franchisee." Compl. at ¶ 51. On the other hand, plaintiffs allege that they had information about the Mobil supply arrangements at least by the time they signed their local franchise agreements because they were required to sign Mobil supply and equipment agreements at the same time as they signed the franchise agreement. *Id.* at ¶ 50. They also allege that the requirements agreement was "integrated" into SpeeDee's offering circular, but, in their opposition brief, they state that this did not occur until 1991, and then the disclosure was misleading. *Id.*; Oppos.Memo. at 13. Plaintiffs also allege that neither SpeeDee's FTC disclosure statement, nor the

948

franchise agreement disclosed that franchisees were required to purchase Mobil's products under ten-or-fifteen year, "take-or-pay" supply contracts requiring the purchase of substantial volumes at undisclosed prices to be set by Mobil without negotiation. *Id.* at ¶ 46. Plaintiffs claim that certain information about the Mobil arrangement was included in the SpeeDee operating manual, which they did not receive until after they signed the franchise agreement. *Id.* at ¶ 46.

Plaintiffs allege that defendants have refused to permit them to purchase automotive supplies and financial services from suppliers other than Mobil, which has resulted in their paying higher prices for these products than were available from other suppliers. *Id.* at ¶¶ 56, 60. Plaintiffs claim that breach of the Mobil agreement would also constitute a breach of the franchise agreement. Plaintiffs allege that defendants foreclosed competing suppliers from selling to the franchise network by threatening them with litigation if they sold their products to SpeeDee's franchisees. *Id.* at ¶ 65. Plaintiffs further allege that Mobil's products are inferior because Mobil does little advertising, its products lack name recognition, and there are no Mobil stations in their areas. *Id.* at ¶ 65. As a result, plaintiffs claim that they are at a competitive disadvantage by being forced to purchase the inferior products from Mobil when they would prefer to purchase superior products at better prices elsewhere. Plaintiffs claim to have suffered damages in the form of loss of their investments, good will, profits, and business reputation. *Id.* at ¶ 80. They claim that there are no legitimate business justifications for defendants' restrictive practices. *Id.* at ¶ 75.

Plaintiffs define the relevant product market as the SpeeDee trademarks, trade names and copyrights, or alternatively the market for providing quick automotive oil change, goods and services. *Id.* at ¶¶ 9, 10. Although plaintiffs alleged that the relevant geographic market was local in their complaint, they have retracted this allegation in their opposition brief to assert that the geographic market is nationwide.

Plaintiffs allege that the tying product is SpeeDee's franchise and associated trade and service marks, while the tied products are Mobil lubricants and financial services. *Id.* at ¶ 12. They allege that SpeeDee has significant market power in the tying product market. *Id.* at ¶ 13. Plaintiffs allege that defendants exercise sufficient control over the tying product market to have an anticompetitive effect on the tied product market for Mobil lubricant and financial services.

Plaintiffs also allege that defendants committed fraud by failing to disclose the details of the 15-year contract they signed in 1991 in which SpeeDee received $650,000.00 in exchange for Mobil's becoming the exclusive supplier to the SpeeDee franchise system.

Defendants now bring this motion to dismiss for failure to state a claim under Fed. R.Civ.P. 12(b)(6) and for failure to allege fraud with particularity under Fed.R.Civ.P. 9(b).

## II. DISCUSSION

A federal court must deny a motion to dismiss under Rule 12(b)(6) unless the complaint fails to state any set of facts upon which relief could be granted. *Conley v. Gibson,* 355 U.S. 41, 45–47, 78 S.Ct. 99, 101–03, 2 L.Ed.2d 80 (1957). All well-pleaded facts in the complaint are accepted as true and viewed in the light most favorable to the plaintiff. *Truman v. United States,* 26 F.3d 592, 594 (5th Cir.1994). In deciding a motion to dismiss, the court's inquiry is limited to the facts stated in the complaint and documents either attached to or incorporated into the complaint.[6] *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1017 (5th Cir.1996). The Court will treat defendants' Rule 9(b) motion to dismiss for failure to plead fraud with particularity under the same standard as the Rule 12(b)(6) motion. *Id.*

6. Therefore, the Court will not consider the offering circular that was attached to plaintiffs' opposition brief because it was neither attached to nor incorporated into the complaint. In addition, since none of the documents referred to as attached to the complaint were served on defendants, these documents will likewise not be considered in the Court's decision on this motion.

## A. *Tying Claims*

■ A tying arrangement is " 'an agreement by a party to sell one product but only on condition that the buyer also purchase a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.' " *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 461, 112 S.Ct. 2072, 2079, 119 L.Ed.2d 265 (1992) (quoting *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)). An agreement requiring the buyer to purchase the tied product from some third party can also amount to a tying arrangement, if the tying seller receives some economic benefit or has some economic interest in the third party's sales of the tied product. *See White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 104 (4th Cir.1987) (no tie-in because hospital had no economic interest in CT scan interpretation market); *Roberts v. Elaine Powers Figure Salons, Inc.*, 708 F.2d 1476 (9th Cir.1983) (favorable loans to franchisor from designated supplier created financial interest). *But see Gonzalez v. St. Margaret's House Housing Devel. Fund Corp.*, 880 F.2d 1514, 1518 (2d Cir.1989) (financial interest in tied product not required because this requirement was never adopted by Supreme Court); *Thompson v. Metropolitan Multi–List, Inc.*, 934 F.2d 1566, 1579 n. 12 (11th Cir.1991), *cert. denied*, 506 U.S. 903, 113 S.Ct. 295, 121 L.Ed.2d 219 (1992) (economic interest requirement only applied in and is most needed in franchise cases). Here, plaintiffs' allegations suffice to suggest that SpeeDee had an economic interest in Mobil's sales to the franchisees. Plaintiffs allege that defendants formed a joint venture under which Mobil was to provide financial backing for the development of the franchise system and that SpeeDee's obligations to Mobil, including that its franchisees continue to sell Mobil products exclusively, were secured by liquidated damages and 40% of its stock.

■ Not every tying arrangement is illegal. A tying arrangement violates Section 1 of the Sherman Act if the seller has "appreciable economic power" in the tying product market, and the arrangement affects a substantial volume of commerce in the tied product market. *Kodak*, 504 U.S. at 462, 112 S.Ct. at 2079–80. Under Fifth Circuit authority, plaintiffs may establish that a tying arrangement is illegal per se under the antitrust laws by demonstrating that SpeeDee had sufficient control over the tying market, here allegedly the SpeeDee trademarked franchise for fast lube businesses, to have a likely anticompetitive affect on the tied product market, the sale of lubricant products and related equipment and services to the SpeeDee franchise network. *See Breaux Brothers Farms, Inc. v. Teche Sugar Co., Inc.*, 21 F.3d 83, 86 (5th Cir.1994). Alternatively, plaintiff may prevail by establishing that the arrangement is invalid under the rule of reason, under which plaintiff must allege an actual adverse effect on competition in the tied product market. *Id.* at 87.

■ Invocation of the per se rule requires "significant market power in the tying market." *Id.* Market power is generally measured by market share, but it can be demonstrated by direct evidence that defendants raised prices and drove out competition in the tied product market. *See id.* at 87 & 87 n. 3 (citing *Kodak*, 504 U.S. 451, at 477, 112 S.Ct. 2072, 2087–88, 119 L.Ed.2d 265) (reasonable to infer defendant has power to raise prices and drive out competition in aftermarket if plaintiffs provide evidence that defendants did so). When market share is offered as the measure of market power, some courts have used 30% as a benchmark below which market share is insufficient to establish sufficient market power to invoke the per se rule. *See, e.g., Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 797 (1st Cir. 1988); *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 672 (7th Cir.1985), *cert. denied*, 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986). This result is based on the Supreme Court's decision in *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), in which the Court found a 30% market share insufficient to warrant application of the per se rule to a challenged tying arrangement. 466 U.S. at 27, 104 S.Ct. at 1566. The Fifth Circuit has not specifically endorsed a 30% safe harbor. *See Breaux Brothers*, 21 F.3d

83, 87 (discussing but not expressly adopting 30% benchmark).

Defendants challenge plaintiffs' tying claim on the grounds that plaintiffs have failed to allege that the defendants have market power in the tying product market or that the arrangement creates the potential for anticompetitive harm in the tied product market. Defendants assert that a single-brand market power theory is inapplicable here and that, since plaintiffs admit that SpeeDee is the fourth or fifth largest player in the national fast lube market, it cannot have more than a 25% market share, which is insufficient under *Jefferson Parish* to invoke the per se rule against tying.

In response, plaintiffs state that this case involves a conspiracy between a business format franchisor, who licenses a bundle of intellectual property rights to a business system, and a supplier to impose "aftermarket" ties on the franchise system for the purchase of 100% of their requirements for equipment, lubricants and financial services for a period of ten years. Plaintiffs claim that these tied products constitute a separate market from the franchise because they are sold separately by other oil companies. Plaintiffs claim that they have alleged that defendants actually exercised market power in the tied product market because they have alleged that Mobil's prices for the tied products are supracompetitive and that defendants have foreclosed access to the aftermarket to competitive suppliers based on coercion and not on competition on the merits. Plaintiffs claim that they had inadequate information to evaluate the Mobil arrangement and they are locked into the tying product, the SpeeDee franchise, by virtue of high "switching costs" associated with a long-term franchise agreement, in which the franchisees have invested up to $1 million, which is subject to a post-term covenant not to compete. Plaintiffs claim that their tie-in allegations pass muster under the United States Supreme Court's decision in *Eastman Kodak & Co. v. Image Technical Serv., Inc., supra.*

In *Kodak*, the United States Supreme Court affirmed a reversal of a summary judgment in favor of Kodak. Kodak had been sued for illegal tying and monopolization under the Sherman Act. Kodak manufactured and sold photocopiers and micrographic equipment. It also sold service and replacement parts for its equipment.

The Kodak plaintiffs were independent service organizations ("ISO's"), who had serviced Kodak equipment for lower prices than Kodak until Kodak adopted policies to limit the availability of parts to them and to make it more difficult for them to service Kodak's equipment. As a result, ISO's could not get Kodak parts from reliable sources and they were either forced out of business or lost substantial revenues. The ISO's introduced evidence that some customers switched to Kodak's service even though they preferred the ISO's service, and that Kodak's prices were higher than the ISO's.

The Kodak plaintiffs alleged that Kodak tied the sale of service of its machines to the sale of its parts. Kodak had less than 25% of the market for the primary equipment, and it argued that, as a matter of law, its lack of market power in the primary equipment market precluded it from having market power in derivative parts and service aftermarkets. Kodak claimed that even if it had a monopoly over the parts market, competition in the equipment market would prevent it from raising parts and service prices to supracompetitive levels because consumers would simply switch to other equipment with lower service costs.

The Supreme Court refused to adopt a substantive legal rule that equipment competition precluded a finding of market power in the derivative aftermarkets because defendants had produced no facts or data indicating that the proposed rule actually reflected market realities. Defendant's argument was based principally on economic theory. The Court exposed the factual assumptions underlying Kodak's proposed rule and found them wanting. First, if higher service prices ineluctably led to a precipitous drop in equipment sales, then one would expect to see Kodak's sales drop when service prices rose. Yet, there was no evidence that Kodak lost equipment sales as a result of rising service prices.

The Court accepted the reasonableness of the ISO's proffered explanation for the lack of responsiveness of equipment demand to service and parts prices. It found that the existence of significant information and switching costs could "create a less responsive connection between service and equipment sales." 504 U.S. at 473, 112 S.Ct. at 2085. In order for consumers to take service and parts prices into account at the time of purchasing Kodak's equipment, they would need accurate information about the cost of the total package of equipment, parts and service, *i.e.,* accurate lifecycle prices. *Id.* In the case of complex durable equipment, the information needed to arrive at an accurate lifecycle price was substantial and it required sophisticated analysis. Further, the Court indicated that this information was difficult if not impossible to obtain at the time of purchase because service and parts prices and warranties, as well as the consumers' specific repair needs could change over the life of the machine. Further, to the extent that sophisticated purchasers could figure out the unattractiveness of Kodak's parts and service prices, Kodak could buy them off with a better package deal, while still reaping the benefits of higher prices from the unsophisticated consumer. *Id.* at 475, 112 S.Ct. at 2086–87. The Court indicated that given these possibilities it made little sense to assume without proof that consumers bought equipment based on an accurate assessment of the total cost of equipment, services and parts over the life of the machine.

The second factor that could undermine the relationship between primary equipment sales and service and parts prices was the costs to the current owners of switching to different products. *Id.* at 476, 112 S.Ct. at 2087. If the costs of switching are high relative to the increase in service prices, customers who already owned Kodak equipment would tolerate some degree of supracompetitive pricing in the aftermarket for services. The Court found that there was evidence of such high switching costs, given the expense and uniqueness of Kodak's equipment, and that there was evidence that Kodak discriminated in package prices to various customers. In sum, the Court found that evidence of information and switching costs created fact issues regarding Kodak's ability to exercise market power in the service and parts markets even though it competed in the primary equipment market.

Plaintiffs argue that *Kodak* applies in the franchise context and that SpeeDee's control over its trademarked franchise permitted it to force them to purchase unwanted, inferior and overpriced Mobil products over the life of the franchise. Plaintiffs argue that they were prevented or "locked-in" by high switching costs from abandoning their investment in the franchise because they would lose their significant capital investment (up to $1.0 million in plant and equipment), they would face significant penalty payments to both Mobil and SpeeDee, and would be barred from the industry by virtue of a non-competition covenant.

Defendants respond by making two basic arguments: (1) that *Kodak* does not apply to the franchisor/franchisee relationship; and (2) that plaintiffs were aware of the tying arrangement before entering the franchise agreement, so that they could have shopped around for another, comparable franchise.

Defendants rely on a recent district court case, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 922 F.Supp. 1055 (E.D.Pa.1996), for the proposition that *Kodak* does not apply to the franchise context. In *Queen City,* plaintiffs were franchisees who by virtue of their franchise agreement with Domino's Pizza were required to purchase their pizza ingredients from the franchisor. *Id.* at 1057–59. The district court dismissed plaintiffs' illegal tying claim and rejected their attempt to invoke *Kodak.* It reasoned that *Kodak* did not apply because the service market in *Kodak* arose out of the unique nature of Kodak machines, not by virtue of a franchise agreement. *Id.* at 1062–63. This Court is not convinced that a principled distinction can be drawn as a matter of law between the franchise context and the durable equipment market involved in *Kodak.* No facts have been adduced to indicate that a business format franchise cannot create a derivative aftermarket for the purchase and sale of products that must be used in the franchise

operation by the franchise network. Nor have facts been adduced that such an after-market could not be subject to the same economic dislocations that permitted market power to be possible in *Kodak.* The *Kodak* court did not purport to base its market power analysis solely on the fact that Kodak's machines were unique, nor did it limit the application of its reasoning to durable equipment markets. If anything, *Kodak* cautions against making economic assumptions on a blank factual record. *See Kodak,* 504 U.S. at 466–67, 112 S.Ct. at 2081–82.

Indeed, it would appear that franchisees could face the same type of switching and information costs as the Kodak equipment owner because the size of the capital investment in a business format franchise may well outstrip the cost of investing in a Kodak copier, and the franchise agreement can involve a long-term arrangement in which the franchisee invests in brand development, which may make switching to another franchise costly. Moreover, franchisees may also have high information costs in obtaining an accurate lifecycle price of the franchise plus the tied items. This is particularly true if both the franchise and the supply arrangements are long-term, without full disclosure about current and future prices and requirements for the tied items, and the franchisee is unable to predict or assess his total product, equipment and financing needs over the life of the franchise at the point of purchase. Further, the *Queen City* decision is contrary to much learned economic and legal commentary on the potential impact of the *Kodak* decision on franchise tie-in claims.[7] For all of these reasons, the Court declines to follow the *Queen City* decision.

The Court is also mindful of the Fifth Circuit's recent decision in *United Farmers Agents Association, Inc. v. Farmers Insur-*

*ance Exchange,* 89 F.3d 233 (5th Cir.1996). There, the Court affirmed a summary judgment dismissing tying claims by insurance agents who asserted that five insurance companies had tied access to computerized policyholder information to the purchase of specially configured IBM computers. The Court found that the insurance companies lacked sufficient market power in any market to support an illegal tying claim. Although the Court stated that market power is not conferred simply by virtue of a franchise or contract relationship, it expressly addressed the issues of whether there was evidence of high information or switching costs to justify invocation of *Kodak.* Finding no such evidence, the Court affirmed summary judgment for the insurers. If anything, this decision suggests that when parties seek to invoke *Kodak,* issues of information costs and switching costs must be addressed before tying claims can be rejected out of hand.

Defendants' next argument is that even if *Kodak* applies to a franchise situation, the plaintiffs are unable to state a per se tying claim because they were aware of the tying arrangement when they entered the franchise agreement. This is a far more serious obstacle to plaintiffs' claims. Defendants' thesis is that if plaintiffs were told of the tie-in before they were locked-in to the franchise, high information costs would not prevent them from shopping around for a better deal with another franchisor before they locked into the franchise. This would allow competition in the primary market for competing franchises to constrain the exercise of market power in the aftermarkets for lubricant products and financial services. *See Digital Equipment Corp. v. Uniq Digital Technologies, Inc.,* 73 F.3d 756, 763 (7th Cir. 1996) (reading *Kodak* to suggest that had

**7.** *See, e.g.,* Janet L. McDavid, *Kodak Decision Revitalizes Tying Claims,* 12 Franch.L.J. 3, 6 (1992); Philip E. Areeda and Herbert Hovenkamp, Antitrust Law, § 1709.2(c)(2) (Supp.1995); Margaret E. Guerin–Calvert, *Assessing the Implications of Kodak for Franchise Market Power Issues, Assessing Market Power in the Post–Kodak World,* 1, 3–5 (ABA Section of Antitrust Law Spring Meeting, March 27, 1996); Andrew C. Selden, *Franchise Market Power in a Post–Kodak Universe, Assessing Market Power in the Post–*

*Kodak World,* 10 (ABA Section of Antitrust Law Spring Meeting, March 27, 1996); Jonathan Solish, *Market Power in Per Se Franchise Tying Claims: Virtual Maintenance Decision Addresses "Locked–In" Buyers,* 13 Franch.L.J. 73 (1994); Arthur I. Cantor, *Tying, Exclusive Dealing, and Franchising Issues,* 890 PLI 869 (1995); George A. Hay, *Is the Glass Empty or Half Full?: Reflections on the Kodak Case,* 62 Antitrust L.J. 177, 185–88 (1993).

Kodak informed its customers about its policies prior to purchase, purchasers could have gotten competitive lifecycle prices); *Lee v. Life Ins. Co. of North America*, 23 F.3d 14, 20 (1st Cir.1994) (*Kodak* means that if customers had been aware at the time they bought Kodak's equipment that Kodak would implement its restrictive parts policy, market power would only have been as significant as Kodak's market share in the copier market.).

■ Defendants in essence urge the Court to adopt a rule of law that if the tie-in is disclosed at the outset of the franchise relationship there can be no exercise of market power in the aftermarket for products used in the franchise if the franchisor does not have a sizable market share in the primary market. The Court agrees that availability of information about SpeeDee's policy is highly relevant to the existence of information and switching costs. *See United Farmers Agents Ass'n*, 89 F.3d at 238 (agents who were hired after implementation of policy had virtually no information or switching costs because policy was disclosed, and there was no evidence that costs of electronic access could not be easily obtained). However, it is not at all clear on this record what was disclosed to these plaintiffs about the Mobil supply arrangements or when it was disclosed. Second, it is not self-evident to this Court that before-the-fact disclosure of the tie-in means in all cases that information costs are not so high as to preclude accurate lifecycle pricing. Although *Kodak* involved a situation in which some consumers were not aware of the tying arrangement until they were "locked in," the court's discussion of information costs did not presume that consumers were already locked-in. Instead, the court examined the problems of acquiring accurate lifecycle prices for the package of equipment, parts and services at the point of purchase. It may well be that disclosure that a tie-in exists does not allow accurate lifecycle pricing of a long-term franchise agreement and the purchase of ten-years' worth of tied products, equipment and financial services. *See generally* Selden, *Franchise Market Power* at 19 (*Kodak* "suggests that a single brand after market tie-in may still be illegal, even if practice is disclosed at the time of sale of the franchise, and is

imposed from the outset of the franchise relationship"); McDavid, *Kodak Decision Revitalizes* at 7 ("likely to be fact issues concerning the ability of buyer or franchisee to predict costs of being 'locked in' at the time of initial investment"). As noted, the complaint does not make clear what plaintiffs knew and did not know before they entered the franchise agreement about the Mobil tie-in. Reading their allegations in their favor, as the Court must do on a Rule 12 motion, they assert that the scope of the tie-in was not fully disclosed and that it was a "hidden condition" of the franchise agreement. They also allege that their ignorance of the financial relationships between Mobil and SpeeDee prevented them from understanding that SpeeDee would never approve alternative suppliers and would tolerate Mobil's overcharging them for tied products. It is also apparent from plaintiffs' brief, but not from the complaint, that some plaintiffs were franchisees prior to SpeeDee's alleged imposition of the Mobil supply arrangement, so that they could have substantial switching costs associated with losing their franchise investment if they chose to extricate themselves from the franchise instead of accepting the tie-in. Further, as was the case in *Kodak*, it appears from the complaint that, despite Mobil's supracompetitive prices, SpeeDee has not lost market share in the primary fast lube franchise market and may have increased it. Compl. at ¶ 70 (with Mobil's assistance, SpeeDee attained market share just behind Pennzoil, Quaker State and Valvoline).

Plaintiffs allege that they were forced to purchase Mobil's products on a take-or-pay basis over a ten-year period at prices to be set by Mobil and to use Mobil's financial services and equipment. These facts suggest that the lifecycle costs of the franchise and the tied products could be difficult to predict accurately at the point of purchasing the franchise. It could be difficult to assess what one's needs for Mobil's products and services would be over a ten-year period. Moreover, Mobil was not locked in to the prices it would charge over the life of the agreement so that future prices for the whole range of tied

products could not be assessed at the point of purchase.

In sum, absent a factual record as to the information that was available to each plaintiff at the time that he entered the franchise agreement, as well as a factual record that would permit a determination that available information was sufficient to permit accurate lifecycle pricing, the Court cannot as a matter of law find that plaintiffs have failed to allege a claim under *Kodak.* This is true because switching costs once the franchisee is locked-in to the franchise were allegedly substantial (loss of investment, penalties, liability to Mobil, enforcement of noncompetition covenant).

■ Defendants also claim that plaintiffs have failed to state a tie-in claim under the Rule of Reason. To state a claim under the Rule of Reason, the plaintiffs must allege that the tying arrangement had an "actual adverse affect on competition" in the tied product market. *Jefferson Parish,* 466 U.S. at 31, 104 S.Ct. at 1568; *Breaux Brothers,* 21 F.3d at 87. Plaintiffs have alleged an anticompetitive effect on the tied product market in that they allege that other suppliers of lubricant products have been foreclosed from marketing their products to the SpeeDee franchise network by virtue of the coercive force of Mobil's exclusive supply arrangements. Plaintiffs also claim that Mobil's prices are supracompetitive, that its products are inferior, and they are unable to purchase the competitive products they desire by virtue of the tying arrangement. Accepting these allegations as true, they are sufficient to assert an anticompetitive effect in the tied product market. *See Kodak,* 504 U.S. at 465, 112 S.Ct. at 2081 (evidence of increased prices, excluded competition and unwanted purchases in tied service market would entitle plaintiffs to trial).

■ Finally, the Court agrees with defendants that plaintiffs have failed to state a claim for illegal tying under Section 3 of the Clayton Act, 15 U.S.C. § 14. This section requires both the tying and tied products to be goods. *Crossland v. Canteen Corp.,* 711 F.2d 714, 718 n. 1 (5th Cir.1983). Here the tying product, a trademarked franchise, is not a commodity, and plaintiffs have there-fore failed to state a claim under Section 3 of the Clayton Act.

### B. *Price–Fixing*

■ Defendants argue that plaintiffs have failed to state a claim for price fixing in violation of Section 1 of the Sherman Act. Plaintiffs pled that Mobil's supply contracts with the franchisees give Mobil the "unilateral" right to set the price for its products to the franchise network, a practice that constitutes per se illegal price-fixing. *See* First Amend.Compl. at ¶ 50. Plaintiffs also alleged conclusorily that defendants have unlawfully conspired to fix the price of lubricants to plaintiffs, which they allege is a per se violation of the Sherman Act.

Defendants argue that plaintiffs' allegation that Mobil had the "unilateral" right to set its prices is an admission that there was no conspiracy to fix prices as is required for a price-fixing violation. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 767–68, 104 S.Ct. 2731, 2739–40, 81 L.Ed.2d 628 (1984) (Section 1 of the Sherman Act does not reach unilateral action). Reading the complaint in plaintiffs' favor, it is apparent that the "unilateral" language pled by plaintiffs means only that Mobil had the right to impose prices on the plaintiffs without negotiation. Nevertheless, the Court finds that plaintiffs have failed to state a claim for per se illegal price-fixing. Mobil and Spee-Dee are not horizontal competitors, since they do not sell the same products in the same markets. The per se rule against price-fixing applies to agreements by horizontal competitors to fix prices (*e.g., United States v. Trenton Potteries Co.,* 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927)) and to vertical agreements to fix resale prices. *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). SpeeDee's alleged agreement with Mobil does not eliminate price competition between them because there was no competition between Mobil and SpeeDee to eliminate. Nor is SpeeDee a reseller of Mobil's products. Since plaintiffs have failed to allege a situation to which the per se rule applies, plaintiffs have failed to state a claim for per se illegal price-fixing.

Hence, plaintiffs' claim for per se illegal price-fixing is dismissed.

### C. *Federal Trade Commission Act*

■ Plaintiffs claim that defendants' tying arrangement violates Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Defendants are correct that Section 5 does not provide a private right of action, so that plaintiffs have no claim under the FTC Act. *See Fulton v. Hecht,* 580 F.2d 1243, 1249 n. 2 (5th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979). Accordingly, plaintiffs' claim for violation of the Federal Trade Commission Act is dismissed.

### D. *Fraud*

■ Mobil attacks plaintiffs' fraud claim on the ground that it had no duty to disclose the details of its agreements with the SpeeDee defendants. Whether a duty exists is a question of law. *E.g., Mundy v. Dept. of Health and Human Resources,* 620 So.2d 811, 813 (La.1993). The Court agrees that absent a duty to disclose, silence with respect to the details of a business transaction does not constitute fraud. *See Guidry v. Bank of LaPlace,* 661 So.2d 1052, 1059 (La.App. 4th Cir.1995), *writ denied,* 666 So.2d 295 (La.1996); *First Downtown Development v. Cimochowski,* 613 So.2d 671, 677 (La.App.2d Cir.1993), *writ denied,* 615 So.2d 340 (La.1993). A duty to disclose does not arise absent special circumstances, such as a fiduciary or confidential relationship between the parties. *Greene v. Gulf Coast Bank,* 593 So.2d 630, 632 (La.1992); *First Downtown,* 613 So.2d at 677. Plaintiffs do not allege in their complaint that Mobil was a party to the franchise agreement, and they have not alleged any facts that would give rise to a fiduciary or other confidential relationship between Mobil and themselves. Although they allege a contractual fiduciary duty, fiduciary duties do not arise from ordinary supplier-customer contracts. The Court therefore finds that Mobil had no duty of disclosure to the plaintiffs, so that they have failed to state a claim for fraud against Mobil.

Both Mobil and the SpeeDee defendants further contend that plaintiffs have failed to allege fraud with particularity as is required by Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires allegations of the "particulars of time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Tel–Phonic Services, Inc. v. TBS International, Inc.,* 975 F.2d 1134, 1139 (5th Cir. 1992) (quoting 5 Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1297, at 590 (1990)). It is true that plaintiffs have made some allegations concerning misleading statements or omissions but their allegations of time, place, and contents of the statements, as well as of the identity of the person making the representations or omissions are deficient. As the Court noted elsewhere in this opinion, it is difficult to determine from plaintiffs' complaint what information the defendants are alleged to have disclosed to the plaintiffs and what information they are alleged to have failed to disclose. The complaint is internally contradictory on these issues. Accordingly, plaintiffs' fraud claims are dismissed under Rule 9(b) against the SpeeDee defendants. The dismissal is without prejudice and with leave to amend to assert the particulars of the time, place, and contents of the misrepresentations and nondisclosures relied on, as well as of the identities of the parties involved in making the alleged representations to the plaintiffs.

### III. *CONCLUSION*

The Court's ruling on the tying issue means only that plaintiffs have made sufficient allegations to survive a motion to dismiss. Many of defendants' arguments would have been made more appropriately on a well-developed summary judgment record. Given the Supreme Court's distaste for the imposition of legal rules divorced from evidence of marketplace realities, this Court is constrained to deny defendants' motion on the tying claims.

Accordingly, defendants' motion to dismiss plaintiffs' tying claims under the Sherman Act and the Louisiana antitrust laws is de-

nied. The motion is granted as to plaintiffs' claims for per se illegal pricefixing, tying under Section 3 of the Clayton Act, violations of Section 5 of the Federal Trade Commission Act and fraud. The fraud claim against the SpeeDee defendants is dismissed without prejudice.