LAY, Circuit Judge,
dissenting.
I respectfully dissent.
The district court, at the pleading stage, dismissed plaintiffs’ complaint alleging violations under § 1 and § 2 of the Sherman Antitrust Act holding that plaintiffs failed to allege a relevant market. The issue is complex. Judge Scirica’s opinion is logically reasoned. Our differences lie in the interpretation and application of the Supreme Court’s recent opinion in Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). I respectfully submit, for the reasons that follow, that the district court’s opinion in this case rests on several incorrect hypotheses. To the extent that the majority adopts the district court’s rationale, I dissent.
The district court rejected as a matter of law the plaintiffs’ alleged relevant market, that of the derivative aftermarket for ingredients and supplies among Domino’s Pizza, Inc. (“DPI”)’s franchisees. The district court found that “[t]he economic power DPI possesses results not from the unique nature of *445 the product or from its market share in the fast food franchise business, but from the franchise agreement.”[1]
The plaintiffs allege that DPI has harmed the competitive process by “foreclos[ing] in-terbrand competition in the market for distributing approved Ingredients and Supplies to Domino’s franchisees.” The plaintiffs argue that DPI prevented a franchise cooperative and other distributors of ingredients and supplies from entering that market. By stopping any interbrand competition for ingredients and supplies for DPI franchisees, DPI, according to the pleadings, has excluded other potential distributors, and thereby preempted market forces from disciplining the sale of ingredients and supplies.

Interchangeability

In adopting the district court’s approach to relevant market definition, the majority reasons that all ingredients and supplies, whether or not approved by DPI, are interchangeable for making pizzas generally and therefore must be included within the relevant market. Kodak made a similar argument. As in Kodak, this ignores the reality that there are no substitutes for ingredients and supplies sold only by DPI. The majority’s approach to the interchangeability concept is not faithful to the purpose of interchangeability analysis or the Supreme Court’s understanding of market definition and power. The purpose of analyzing interchangeability is to find competing products which are reasonable substitutes and thereby prevent market power.[2] In Kodak, the question was whether the cross-elasticity of demand between the equipment market and the derivative aftermarkets for parts and service was sufficient to deprive Kodak of market power. Our question is whether the interchangeability of, or cross-elasticity of demand between, DPI-approved ingredients and supplies and other ingredients and supplies is sufficient to make the alleged relevant market invalid. The issue, whether under the framework of market power as it was in Kodak, or as market definition as here, is whether competition from other providers of ingredients and supplies for pizzas will restrain the power of DPI over ingredients and supplies it sells to franchisees. See Kodak, 504 U.S. at 469 n. 15. The plaintiffs allege not only that they are limited to buying ingredients and supplies from DPI, but also that information and switching costs prevented them from anticipating and being able to respond to DPI’s power to substantially raise price for the ingredients and supplies. They allege that competition from independent providers of ingredients and supplies does not restrain DPI’s power in the aftermarket for ingredients and supplies, and therefore ingredients and supplies not approved by DPI need not be included in the relevant market.[3]

*446
Information and Switching Costs

A closely related problem with the district court’s opinion is its scant treatment of information and switching costs and their relevance to defining a valid relevant market. The plaintiffs argue that they have experienced information and switching costs which have prevented them from anticipating or responding to the price increases for ingredients and supplies from DPI. They argue that these information and switching costs create a “lock-in” which makes the aftermarket for DPI-approved ingredients and supplies the relevant market. Specifically, the imperfect information they proffer is that the franchisees “could not foresee that Domino’s would not follow the policy represented in its Offering Circular and would, instead, commence excluding potential suppliers in order to foreclose competition in the aftermarket.” They suggest switching costs arise from sunk costs in the franchise, limits on franchisees’s ability to sell their franchise, and noncompetition covenants in the Standard Franchise Agreement.
An important part of the Supreme Court’s decision in Kodak that the plaintiffs presented a triable claim was that “there is a question of fact whether information costs and switching costs foil the simple assumption that the equipment and service markets act as pure complements to one another.” Kodak, 504 U.S. at 477, 112 S.Ct. at 2087. In fact, other circuit courts have held that the presence of these market imperfections was the crucial factor in Kodak, and that had Kodak’s policy been known at the time busi-
nesses bought copiers from Kodak, the result would have been different.[4] See PSI Repair Servs., Inc. v. Honeywell, Inc., 104 F.3d 811, 820 (6th Cir.1997) (“We likewise agree that the change in policy in Kodak was the crucial factor in the Court’s decision. By changing its policy after its customers were ‘locked in,’ Kodak took advantage of the fact that its customers lacked the information to anticipate this change.”), cert. denied, — U.S. -, 117 S.Ct. 2434, 138 L.Ed.2d 195; see also Digital Equip. Corp. v. Uniq Digital Techs., Inc., 73 F.3d 756, 763 (7th Cir.1996); Lee v. Life Ins. Co. of North America, 23 F.3d 14, 20 (1st Cir.1994). Several commentators have described how the analysis from Kodak could mean that franchisors’ derivative aftermarkets may be relevant antitrust markets. Meese, 95 Mich. L.Rev. at 152 (“Under current law, [post-contract market power] can arise once the cost to the franchisee of switching to a different franchise is significant____”); Warren S. Grimes, When Do Franchisors Have Market Power? Antitrust Remedies For Franchisor Opportunism, 65 Antitrust L.J. 105, 112 (1996) (“A franchisor has market power if it can, without losing substantial sales, raise the price of a good or service sold to a franchisee above the level at which an equivalent good or service is available from other suppliers.”); see also Robert H. Lande, Chicago Takes It On The Chin: Imperfect Information Could Play A Crucial Role In The Posi-Kodak World, 62 Antitrust L.J. 193, 195 (1993) (“Another important lesson of Kodak is that imperfect information can be a crucial factor in *447 defining relevant markets.”). But see Alan Silberman, The Myths of Franchise “Market Power”, 65 Antitrust L.J. 181, 217 (1996).

Uniqueness

In rejecting the plaintiffs’ theory that the information and switching costs they face justify the alleged relevant market under Kodak, the majority states: “Kodak does not hold that the existence of information and switching costs alone, such as those faced by the Domino’s franchisees, renders an otherwise invalid relevant market valid.” Ante at 439 (footnotes omitted). Both the district court and the majority make a more difficult argument, that a necessary factor in Kodak was that the repair parts were “unique.” They state that this uniqueness is what gave Kodak market power, and that the lack of this factor herein warrants rejecting the plaintiffs’ alleged relevant market. The basis for not applying Kodak in this case lies in two arguments: (1) the aftermarket ingredients and supplies are not unique, and (2) the franchisees knew of the policy because it was contained in the franchise agreement.
The first argument fails as a matter of law. Whether the product is unique was not the key component of the Kodak opinion. Even if the Court was somehow preoccupied with the “uniqueness” of the Kodak replacement parts, the opinion itself as well as economic theory suggest that uniqueness was not a sine qua non in finding a triable claim of market power. Justice Blackmun describes the plaintiffs’ allegations regarding the market realities, including the facts that Kodak had excluded independent parts distributors and service competition and then boosted prices above prior levels. After this discussion, Justice Blackmun states: “Under our prior precedents, this evidence would be sufficient to entitle respondents to a trial on their claim of market power.” 504 U.S. at 465.[5] The term unique seems to be important for antitrust purposes only in describing a product which has no reasonable substitutes.[6] The fact that Kodak parts were unique was important only because it limited the choices available to Kodak equipment owners seeking to replace worn out parts. The Court stated: “The relevant market for antitrust purposes is determined by the choices available to Kodak equipment owners.” 504 U.S. at 481-82. Here, the plaintiffs’ choices are limited to DPI-approved ingredients and supplies, and therefore the alleged relevant market is identical in kind to that involved in Kodak.
In Wilson v. Mobil Oil Corp., 940 F.Supp. 944 (E.D.La.1996), the district court analyzed the relevance of the Kodak opinion to the franchise context. The defendants argued that Kodak does not apply to the franchisor/franchisee relationship and cited the district court opinion from this case for support. Wilson, 940 F.Supp. at 951. The court rejected the argument that the lack of unique products, like Kodak parts, makes Kodak inapplicable to the franchise relationship:
This Court is not convinced that a principled distinction can be drawn as a matter of law between the franchise context and the durable equipment market involved in Kodak. No facts have been adduced to indicate that a business format franchise cannot create a derivative aftermarket for the purchase and sale of products that must be used in the franchise operation by the franchise network. Nor have facts been adduced that such an aftermarket could not be subject to the same economic dislocations that permitted market power to be possible in Kodak. The Kodak court did not purport to base its market power analysis solely on the fact that Kodak’s machines were unique, nor did it limit the *448 application of its reasoning to durable equipment markets. If anything, Kodak cautions against making economic assumptions on a blank factual record. See Kodak, 504 U.S. at 466-67, 112 S.Ct. at 2081-82.
Id. at 951-52. This analysis is compelling because it incorporates the understanding that a unique product does not itself confer market power and then analyzes the workings of the market in question.[7]
The majority also distinguishes Virtual Maintenance, Inc. v. Prime Computer, Inc., 11 F.3d 660 (6th Cir.1993), on the basis of the importance of a unique product. In Virtual Maintenance, the Sixth Circuit was directed by the Supreme Court, in light of its opinion in Kodak, to reconsider the Sixth Circuits’ earlier rejection of the plaintiffs antitrust claims. Upon reconsideration in light of Kodak, the court upheld the alleged relevant market for “the sale of software revisions and support of software necessary to do business with Ford Motor Company.” Id. at 664 (citation omitted). In upholding the derivative aftermarket as a relevant market, the court held: “Like Kodak, Prime is able to exercise control over the sale of software support because of its exclusive distribution license from Ford, and Ford’s requirement that its automotive design suppliers use the most current version of Prime’s software support.” Id. at 666. The majority in the present case rejects application of Virtual Maintenance to this case: “But Prime had a monopoly because it possessed a unique product that no one else sold. Since the product was unique, and not interchangeable with any other products, it constituted its own relevant market for antitrust purposes. By contrast, Domino’s does not sell a unique product or service.” Ante at 440-41. However, this misstates the facts; Prime’s product was not unique. In fact, the plaintiffs in Virtual Maintenance made products that were reasonably interchangeable with that of Prime. Thus, this analysis slights the significance of Prime’s distribution license from Ford and Ford’s requirement that suppliers use the latest version of Prime’s product. The Sixth Circuit analyzed the market realities, including evidence of price manipulation and an economic lock-in, and concluded that under Kodak the alleged relevant market was valid.

The Franchise Agreement

The second argument, that the alleged relevant market fails because franchisees knew of the policy, fails as a matter of fact. Adopting the district court’s position, the majority states that the franchisees knew the potential costs and economic risks of DPI forcing them to buy ingredients and supplies only from DPI at supraeompetitive prices because the franchise agreement gave DPI the power to do so. Ante at 440. This statement is illusory for two reasons. First, it ignores the information in the Offering Circulars: the plaintiffs are supposed to have anticipated these actions despite the fact that they are directly contrary to what DPI told them. The plaintiffs argue that the Offering Circulars DPI presented when they were considering a DPI franchise stated that there would be alternative suppliers for the ingredients and supplies. Second, it would be illogical for the franchisees to expect that the franchisor’s right to sell ingredients and supplies coupled with its approval power in the franchise agreement, included for the very legitimate purpose of franchise quality con *449 trol, would be applied in such an odd and predatory way.[8] It seems hard for DPI to argue that the franchise agreement justifies its actions when all it’s doing is buying the ingredients and supplies, marking up the prices, and then reselling them to the franchisees.[9]

Conclusion

Concern is expressed about the possible impact on the franchise industry from adopting plaintiffs’ theory of relevant market definition. However, plaintiffs still have to prove the arguments they present for the alleged relevant market, and seek more discovery in order to do so. There are many defenses, which have not been argued, which may be applicable in this ease or other franchisor/ franchisee antitrust disputes. My main concern with affirming the district court’s opinion is the broad rejection of the basis for any antitrust claims by franchisees against franchisors in derivative aftermarkets. See Grimes, 65 Antitrust L.J. at 125-26 (describing several types of post-contract franchisor opportunism which may lead to antitrust claims if the franchisor has market power). There may be other problems, which are not before the court, with the plaintiffs’ allegations of monopolization and illegal tying in the derivative aftermarkets by a franchisor, but the Supreme Court’s clear direction in Kodak that information and switching costs are relevant to the ultimate determination of market power is honored by the district court only in the breach. The reality of the aftermarket for ingredients and supplies faced by these plaintiffs, according to the pleadings, is that alternative suppliers do not restrain DPI’s ability to increase price, and information and switching costs lock-in the franchisees thereby preventing any competitive response to the price increases from DPI.
For the reasons set forth, I would reverse the district court’s 12(b)(6) dismissal of plaintiffs’ complaint.

.The district court relied on "two influential commentators,” Benjamin Klein and Lester F. Saft, The Law and Economics of Franchise Tying Contracts, 28 J.L. & Econ. 345, 356 (1985) and two pre-Kodak cases, Mozart Co. v. Mercedes-Benz of North America, Inc., 833 F.3d 1342 (9th Cir.1987), and Tominaga v. Shepherd, 682 F.Supp. 1489 (C.D.Cal.1988). The district court adopted the Ninth Circuit's analysis from Mozart that an alleged economic-lock-in is irrelevant to the determination of a defendant’s market power. See Tominaga, 682 F.Supp. at 1494 (quoting Mozart, 833 F.2d at 1346-47). This reasoning is simply irreconcilable with the Supreme Court’s analysis of information and switching costs in Kodak. See Kodak, 504 U.S. at 473-77, 112 S.Ct. at 2085-87.
It should also be noted Professor Klein recognized, contrary to his original thesis, that Kodak permits the recognition of market power in a derivative aftermarket "despite the absence of market power in the equipment market, by taking advantage of imperfectly informed consumers that become ‘locked-in’ to their existing Kodak equipment.” See Benjamin Klein, Market Power in Antitrust: Economic Analysis After Kodak, 3 Sup.Ct. Econ. Rev. 43, 48 (1993).

. The basic definition of market power is "the power to raise prices above competitive levels without losing so many sales that the price increase is unprofitable.” Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and its Practice § 3.1, at 79 (1994) (footnote omitted).

. The majority, in footnote 17, ante at 442, states that the district court’s approach has "received support in recent scholarly literature,” citing Alan J. Meese, Antitrust Balancing in a (Near) Coasean World: The Case of Franchise Tying Contracts, 95 Mich. L.Rev. 111, 128 (1996). However, Professor Meese does not argue that the approach taken is correct under current antitrust law. In fact, on page 126 he concedes that the Kodak decision "found that the existence of relationship-specific investments can confer 'market *446 power’ ”, and at 152-55 he states that "under current law" franchisors may have market power over derivative aftermarkets due to "lock-in" of the franchisees, and because of this he proposes a new framework for analyzing such claims. He argues that "the focus on market power and less restrictive alternatives, though perfectly natural given the partial equilibrium framework that dominates antitrust law and the premises that underlie tying jurisprudence,” does not properly apply to the franchise tying context. Id. at 128. Professor Meese argues that tying contracts that reduce free riding, a form of opportunistic behavior taken at the expense of the franchise system, should be prima facie legal. Whatever the value of Professor Meese’s argument, he presupposes that “under current law” from the Supreme Court the district court in this case may have erred. Id. at 152. In addition, it is not even clear that Professor Meese would find the plaintiffs' allegations insufficient as a matter of law because they allege that DPI charged supra-competitive prices for the ingredients and supplies. See id. at 155.

. This conclusion seems quite sensible. If Kodak customers knew about Kodak’s subsequent parts- and-service policy when they bought the copiers, or were not economically restricted from switching to other copiers, then Justice Scalia’s dissent, which assumes a perfect competition/perfect information world, should be right. Kodak is merely a concession to fact that markets do not always work perfectly, and sometimes, but not always, these imperfections can create sufficient market power to justify possible antitrust liability-

. In Market Power in Aftermarkets: Antitrust Policy and the Kodak Case, 40 U.C.L.A. L.Rev. 1447 (1993), Professor Hovenkamp argues that whether a product requires “unique” replacement parts is absolutely irrelevant to whether the manufacturer of that product has market power. He states that the portion of the Kodak opinion about unique parts is wrong, but that the evidence cited of increased prices was relevant to the question of market power. Id. at 1454-55.

. For example, if someone patented a new material for bottling soft drinks, it would certainly be true that there were no other materials just like it. But, provided glass and plastic were still reasonable substitutes, the description "unique” would not be meaningful for antitrust analysis.

. The majority cities United Farmers Agents v. Farmers Ins. Exchange, 89 F.3d 233 (5th Cir. 1996), cert. denied,-U.S.-, 117 S.Ct. 960, 136 L.Ed.2d 846 (1997), for the argument that a derivative aftermarket defined by contractual restraints must be rejected. However, this case does not stand for the proposition for which it is cited. In United Farmers, the 5th Circuit does cite the statement from Professors Klein and Saft, that the economic power derived from contractual agreements has nothing to do with market power for purposes of antitrust. 89 F.3d at 236-7. However, the court proceeded to expressly address whether there were sufficient information and switching costs to justify invoking Kodak and upholding the plaintiffs’ alleged relevant market. The district court in Wilson addressed the importance of the United Farmers opinion and concluded: "If anything, this decision suggests that when parties seek to invoke Kodak, issues of information costs and switching costs must be addressed before tying claims can be rejected out of hand.” Wilson, 940 F.Supp. at 952.

. It is alleged the DPI’s Offering Circular represented to prospective franchisees that DPI would approve a sufficient number of suppliers to ensure a competitive aftermarket for ingredients and supplies, and that it would only utilize its approval power to maintain quality control.

. Moreover, the majority’s analysis, that what the plaintiffs knew when they entered the franchise agreement is an important distinguishing factor, concedes that imperfect information is a crucial factor in determining relevant market definition.